UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MICHAEL MAZZEO, :
              Plaintiff, :
: **OPINION AND ORDER**
v. :
: 16 CV 2747 (VB)
STEVEN T. MNUCHIN, Secretary, United :
States Department of the Treasury, :
              Defendant. :
------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Michael Mazzeo, a former special agent in the Criminal Investigation division of the Internal Revenue Service ("IRS"), brings this action against defendant Steven T. Mnuchin, United States Secretary of the Treasury,[1] for discrimination based on plaintiff's sex, race, national origin, age, and disability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 ("ADEA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 791 ("Rehabilitation Act"). Plaintiff also brings a retaliation claim, alleging he was threatened with disciplinary action after he filed a complaint with the Equal Employment Opportunity Commission ("EEOC").

      Before the Court is defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Doc. #28).

      For the reasons set forth below, the motion is GRANTED.

      The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

---

[1] Secretary Steven T. Mnuchin is substituted for former Secretary Jacob J. Lew. See Fed. R. Civ. P. 25(d) (providing for automatic substitution of a public officer's successor when the officer ceases to hold office while the action is pending).

1

**BACKGROUND**

The following factual background is drawn from the amended complaint and an August 3, 2015, decision of the EEOC that plaintiff attached to, and relied on, in his opposition brief.

For purposes of deciding the pending motion, the Court accepts as true all well-pleaded allegations in the amended complaint and draws all reasonable inferences in plaintiff's favor.

Plaintiff is a white Italian-American male born in 1965, who at all relevant times was employed as a special agent in the Criminal Investigation division of the IRS.

In December 2008, plaintiff suffered a left rotator cuff impingement injury during defensive tactics training, and on November 5, 2009, underwent left rotator cuff repair surgery. As a result of his shoulder injury, plaintiff was placed on limited duty in May 2010. Plaintiff subsequently experienced a similar injury in his right shoulder.

In February 2011, the United States Attorney's Office for the Southern District of New York ("SDNY") notified plaintiff's supervisors that they would no longer work with plaintiff, nor prosecute any cases assigned to him, because they did not trust him. Plaintiff's SDNY cases were subsequently reassigned to other agents. On March 30, 2011, one of plaintiff's supervisors informed him she would hold weekly meetings with plaintiff to discuss the progress of his investigations, and that he would be expected to develop investigations in the Northern District of New York.

Following a physical examination of plaintiff, IRS medical review officer Dr. Phong Dong Nguyen issued a report on August 11, 2011, concluding plaintiff was not able to perform the duties of a special agent.

Plaintiff was scheduled for a fitness for duty examination on October 5, 2011 (which was subsequently rescheduled due to a conflicting federal holiday), because of concerns regarding

plaintiff's ability to perform fully his duties as a special agent in light of the limited range of motion in his left shoulder following surgery, and his diagnosis of a right rotator cuff tear.

On October 5, 2011, plaintiff's third-level supervisor proposed to suspend plaintiff's receipt of law enforcement availability pay ("LEAP")[2] because, since May 2010, plaintiff had been unavailable to work unscheduled overtime due to his ongoing medical issues.

On November 2, 2011, and again on September 27, 2012, plaintiff claims his supervisor directed him "to use or lose" annual leave prior to his surgeries scheduled for November 10, 2011, and October 18, 2012, respectively. (Am. Compl. ¶ 15).

On November 10, 2011, plaintiff underwent a second surgery on his left shoulder. Prior to this surgery, plaintiff was required to leave his government-issued vehicle, a 2008 Buick Lucerne with 40,245 miles on it, at his office. While out on leave, plaintiff's government-issued vehicle was reassigned to another special agent.

On or about November 30, 2011, while on leave recovering from shoulder surgery, plaintiff was removed as a user from certain IRS computer systems. On January 27, 2012, plaintiff was restored as a user to the IRS computer systems.

On January 1, 2012, plaintiff's LEAP was suspended. Beginning on January 29, 2012, the receipt of LEAP no longer appeared on any of plaintiff's SF-50 Personnel Action Forms.

On January 30, 2012, plaintiff returned to work and was assigned a 2007 Buick LaCrosse with around 45,000 miles on it.

---

[2] LEAP is compensation paid to special agents for unscheduled overtime, equal to 25 percent of the employee's adjusted basic salary subject to a salary cap. To qualify for LEAP, special agents are required to work, or be available to work, at an annual average rate of at least 2 hours per day beyond their regular 8-hour tour of duty, unless management approves a temporary hardship exemption.

3

On or about March 5, 2012, plaintiff received a performance appraisal for the period ending January 31, 2012, that "[in]accurately reflected and failed to fully credit his work performance." (Am. Compl. ¶ 19).

Plaintiff claims beginning on April 6, 2011, he was provided with incorrect information from "Human Capitol officials" regarding leave buy back, and was incorrectly charged 643 hours of sick leave that should have been charged as leave without pay while plaintiff was receiving workers' compensation benefits. (Am. Compl. ¶ 20).

On June 28, 2012, plaintiff was again ordered to attend a fit for duty examination due to concerns raised regarding plaintiff's ongoing shoulder injuries. Dr. Robert Hendler performed an orthopedic evaluation of plaintiff, and concluded plaintiff was not able to perform his job duties safely and efficiently at that time. On July 24, 2012, Dr. Nguyen conducted a medical fitness for duty evaluation of plaintiff, and agreed with Dr. Hendler that plaintiff was unable to perform the full duties of a special agent.

On or about October 9, 2012, plaintiff was notified he no longer met the GS-1811 Treasury Enforcement Agent Qualification Standards, and that he would remain on temporary restricted duty until further notice.

On October 18, 2012, plaintiff had surgery on his right shoulder, and on September 25, 2013, he was cleared to return to full duty.

On June 12, 2014, plaintiff's LEAP was retroactively restored from January 29, 2012–October 6, 2013.

On March 2, 2012, plaintiff filed an EEOC complaint against the IRS, which plaintiff subsequently amended to add additional claims. On July 15, 2015, the EEOC held a consolidated hearing during which plaintiff's supervisor Joan Totani, among others from the

IRS, testified. Plaintiff claims Totani "was not completely truthful in her testimony." (Am. Compl. ¶ 26). On August 3, 2015, the EEOC issued a decision in favor of the IRS.

On August 4, 2015, approximately three weeks after the EEOC hearing, plaintiff was called to a meeting with Totani and his second-level supervisor, Manny Muriel. According to plaintiff, he was "inaccurately" told the meeting would not be "disciplinary" in nature. (Am. Compl. ¶ 27). Plaintiff claims he was "threatened with discipline" for filing his EEOC complaint at the August 4, 2015, meeting. (Id. ¶ 28). On August 18, 2015, Muriel sent plaintiff a follow-up email, instructing plaintiff to cease causing "discord and dissention amongst the employees or management" or possibly face disciplinary action. (Id. ¶ 30; Bretz Decl., Ex. A).

On December 26, 2015, plaintiff resigned from his position with the IRS.

## DISCUSSION

I.  Legal Standard

Pursuant to Rule 12(c), at any time after the pleadings are closed, but before trial commences, a party may move for judgment on the pleadings. The legal standard applicable to a Rule 12(c) motion for judgment on the pleadings and a motion to dismiss pursuant to Rule 12(b)(6) are identical. Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). Accordingly, in deciding a motion under Rule 12(c), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" announced by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion for a judgment on the pleadings. See id. at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." See id.

5

at 679.

To survive a Rule 12(c) motion, the allegations in the complaint must meet a standard of "plausibility." See Ashcroft v. Iqbal, 556 U.S. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." See Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." See id.

"On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (quoting Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009)). "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d at 422 (quoting Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004)).

In reviewing a Rule 12(c) motion, the court may also consider "plaintiff's relevant filings with the EEOC and other documents related to the plaintiff's claim, even if they are not attached to the complaint, so long as those filings are either incorporated by reference or are integral to and solely relied upon by the complaint." Littlejohn v. City of N.Y., 795 F.3d 297, 305 n.3 (2d Cir. 2015) (internal quotation marks omitted).

Courts need not accept as true allegations in the complaint that are contradicted by more specific allegations or documentary evidence integral to the complaint. L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d at 422.

II. Title VII Claim

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Accordingly, a plaintiff asserting a Title VII claim must allege (i) the employer discriminated against him (ii) because of his race, color, religion, sex, or national origin.

With respect to the first element, an employer discriminates against a plaintiff "by taking an adverse employment action against him." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015). An adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal citation omitted). Examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 85 (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)).

With respect to the second element, "an action is because of a plaintiff's race, color, religion, sex, or national origin where it was a substantial or motivating factor contributing to the employer's decision to take the action." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 85 (internal citation omitted). However, "[p]laintiff's subjective belief that he was the victim of

discrimination—however strongly felt—is insufficient to satisfy his burden at the pleading stage." Doe v. Columbia Univ., 101 F. Supp. 3d 356, 371 (S.D.N.Y. 2015), vacated on other grounds, 831 F.3d 46 (2016). Additionally, Title VII is not a general civility code for the American workplace; the challenged actions must truly be discriminatory. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998).

In making a plausibility determination at the motion for judgment on the pleadings stage, the plaintiff's burden is "minimal." See Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015). The question is "whether the well-pleaded allegations plausibly give rise to an inference of unlawful discrimination." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 87. "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to'" an adverse employment action. Littlejohn v. City of New York, 795 F.3d at 312 (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir.2009)). Thus, to defeat a motion for judgment on the pleadings, plaintiff must allege "facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 87.

Here, plaintiff's bare and conclusory allegations fail to state a claim of discrimination on the bases of sex, race, or national origin.

Plaintiff briefly states he suffered "disparate treatment and/or harassment due to his sex (male), race (white), and/or National Origin (Italian American)." (Am. Compl. ¶ 1). The amended complaint does not contain any other references to plaintiff's race, sex, or national

origin, nor does it allege how plaintiff was discriminated against because of these characteristics. In fact, the amended complaint does not contain any allegations of race-based, sex-based, or national-origin based discrimination. It thus fails to provide even "minimal support for the proposition that the employer was motivated by discriminatory intent." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 85.

Moreover, as discussed further below, plaintiff fails to allege a "materially significant disadvantage with respect to the terms of the plaintiff's employment"—i.e., an adverse employment action. Littlejohn v. City of New York, 795 F.3d at 312 n.10.

### A. The Weekly Meetings

Plaintiff claims the weekly meetings with his supervisor to discuss the status of his investigations demonstrates he experienced discrimination. Plaintiff asserts he is not aware of any other senior special agent in his group who was subjected to similar meetings, and that these meetings caused him "humiliation, embarrassment, and victimization." (Pl.'s Opp'n Br. at 2).

As a matter of law, however, being directed to meet with a supervisor once a week to discuss work does not constitute an action sufficiently "materially adverse" to support a claim of discrimination. See Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 252 (D. Conn. 2008) ("[T]here is nothing materially adverse about requiring employees to attend meetings. Meetings are part and parcel of a normal employer-employee relationship."); Morrison v. Potter, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005) ("[B]eing called into a supervisor's office to discuss work issues" does not constitute an adverse action.); Castro v. N.Y. City Bd. of Educ. Pers., 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").

9

Moreover, plaintiff does not allege the weekly meetings were held due to a discriminatory intent on the part of his employer. In fact, the August 3, 2015, EEOC decision, which plaintiff relied on in his opposition brief, indicates the weekly meetings were initiated after the United States Attorney's Office for the Southern District of New York informed plaintiff's supervisors they would no longer prosecute plaintiff's cases because they did not trust him. (Pl.'s Opp'n Br., Ex. 1, at 4).

Accordingly, the weekly meetings do not support plaintiff's discrimination claims.

B.  Annual and Sick Leave

Next, plaintiff alleges he was incorrectly instructed to use accumulated annual leave prior to his shoulder surgeries, and that he was improperly charged 643 hours of sick leave that should have been charged as leave without pay. According to plaintiff, defendant's failure to properly advise him regarding leave use and how to buy back leave demonstrates he was discriminated against.

However, plaintiff does not claim he followed defendant's direction and improperly used his leave before his surgeries. Moreover, plaintiff does not allege any facts tending to show the instruction to use his leave or the improper treatment of sick leave were motivated by a discriminatory animus. Thus plaintiff's conclusory statements regarding the improper instruction to use his annual leave and the improper charge of sick leave fail to defeat defendant's motion.

C.  Reassignment of Government-Issued Vehicle

Plaintiff alleges he was required to leave his government-issued vehicle at his office while he was out on medical leave. Upon his return, plaintiff's vehicle had been reassigned to another employee, and plaintiff was assigned a new vehicle "with substantially more mileage and

in need of repair." (Am. Compl. ¶ 16).³ Plaintiff also claims a "similarly situated" female employee was allowed keep her government-issued vehicle while she was out on maternity leave. (Pl.'s Opp'n Br. at 3).

Not being permitted to keep a government-issued vehicle while on leave and subsequently being issued a different vehicle certainly does not amount to a "material adverse change" in the terms and conditions of his employment. See, e.g., Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (assignment of one vehicle instead of another does not constitute an adverse employment action); Pierre v. Napolitano, 958 F. Supp. 2d 461, 481 (S.D.N.Y. 2013) (temporary reassignment to car alleged to have various mechanical issues was "too trivial a matter to constitute an adverse employment action"); Knox v. Town of Se., 2014 WL 1285654, at *10 (S.D.N.Y. 2014), aff'd, 599 F. App'x 411 (2d Cir. 2015) (summary order) (loss of use of a town vehicle "cannot be characterized as an 'adverse employment action' under even the most liberal reading of the phrase").

Accordingly, the reassignment of plaintiff's government-issued vehicle does not support his discrimination claim.

D. Removal from IRS Computer System

Plaintiff further alleges discrimination based on his removal from IRS computer systems while he was out on leave for shoulder surgery. However, plaintiff readily admits his computer access was restored upon his return to work. Moreover, plaintiff fails to allege how his removal from IRS computer systems during his medical leave adversely impacted his employment, and he fails to allege any facts that could support an inference that such removal from the computer systems was motivated by discriminatory intent.

---

³ Plaintiff's previous vehicle was a 2008 Buick Lucerne with 40,245 miles on it and his replacement vehicle was a 2007 Buick LaCrosse with around 45,000 miles.

11

Accordingly, plaintiff's removal from IRS computer systems while he was out on leave does not support plaintiff's discrimination claim.

E. Ineligibility for LEAP Pay

Plaintiff next argues the determination at the beginning of 2012 that he was ineligible for LEAP pay, which caused him to lose tax-free income, was discriminatory. However, plaintiff's LEAP benefits were restored retroactively in 2014. Moreover, plaintiff does not allege that any discriminatory animus motivated the temporary suspension of his LEAP benefits, nor does he assert any facts demonstrating the temporary loss of such payments—which was subsequently corrected—was "more disruptive than a mere inconvenience." See Pierre v. Napolitano, 958 F. Supp. 2d 461, 480 (S.D.N.Y. 2013) (agent's temporary loss of LEAP payments did not demonstrate plaintiff faced an adverse employment action); see also Dressler v. New York City Dep't of Educ., 2012 WL 1038600 at *8 (S.D.N.Y. Mar. 29, 2012) ("A corrected administrative error without attendant deleterious effect does not constitute an adverse employment action.").

Thus, plaintiff's temporary loss of LEAP benefits does not support his discrimination claim.

F. Performance Evaluation

Plaintiff asserts he was discriminated against when his annual performance review "[in]accurately reflected, and failed to fully credit, his work performance." (Am. Compl. ¶ 19). However, "a negative performance review, without more, does not represent an adverse employment action." Chung v. City Univ. of N.Y., 605 F. App'x 20, 22 (2d Cir. 2015); Kpaka v. City Univ. of N.Y., 2016 WL 4154891, at *7 (S.D.N.Y. Aug. 2, 2016) (quoting Hawana v. City of New York, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002)) ("Negative evaluations can be adverse employment actions only if they give rise to material adverse changes in work conditions.").

12

Here, however, plaintiff has failed to allege his performance evaluation led to a "materially adverse change in the terms or conditions of [his] employment." Galabya v. N.Y. City Bd. of Educ., 202 F.3d at 640 (internal quotation marks omitted). Moreover, plaintiff has again failed to allege his performance review was motivated by discriminatory intent.

Therefore, plaintiff's performance appraisal does not support his discrimination claim.

III. Age Discrimination Claim

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). An individual must be at least 40 years of age to be entitled to the statute's protections. Id. § 631.

Similar to Title VII claims, a plaintiff need only meet a "minimal" pleading standard for an age discrimination claim under the ADEA. Johnson v. Andy Frain Servs., Inc., 2016 WL 210098, at *2 (2d Cir. 2016) (summary order) (citing Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001)). Additionally, the standard for determining whether an action was "adverse" under the ADEA is the same as under Title VII. See Belizaire v. Rav Investigative & Sec. Servs., 61 F. Supp. 3d 336, 348 (S.D.N.Y. 2014).

Unlike Title VII claims, however, a plaintiff claiming age discrimination under the ADEA must establish "that age was the 'but-for' cause of the employer's adverse action." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 86 (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009)). Thus, to survive a motion for judgment on the pleadings, a plaintiff must allege his age was "not merely a motivating factor" of the adverse employment action, but that "he was terminated because of his age." See Barone v. S&N Auerbach Mgmt., Inc., 2016 WL 1237871, at *1 (2d Cir. 2016) (summary order); see also Vega v. Hempstead Union Free Sch.

13

Dist., 801 F.3d at 86, 91 ("But-for causation does not . . . require proof that [the protected characteristic] was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the [prohibited] motive." (alterations and internal quotation marks omitted)).

Plaintiff claims he "suffered disparate treatment and/or harassment due to his . . . age." (Am. Compl. ¶ 1). Plaintiff fails, however, to plead any facts that give rise to an interference of age discrimination—i.e., that his employer made comments regarding his age, that younger employees were treated differently, or that any action whatsoever was taken due to an animus relating to plaintiff's age.

Merely asserting plaintiff was discriminated against due to his age,[4] without more, is the type of threadbare and conclusory allegation that is insufficient to survive a Rule 12(c) motion. See Hedges v. Town of Madison, 456 F. App'x 22, 23 (2d Cir. 2012) (summary order) (affirming dismissal of ADEA claim brought by plaintiff who only alleged he was terminated because he was nearing retirement age); Payne v. Malemathew, 2011 WL 3043920, at *2 (S.D.N.Y. July 22, 2011) (quoting Bell Atl. Corp. Twombly, 550 U.S. at 570) ("[P]laintiff's claim that he was the oldest employee is insufficient to 'nudge [his] claims across the line from conceivable to plausible.'").

Moreover, plaintiff's ADEA claim also fails because he does not allege his age was "the but-for cause" of any adverse action he claims to have suffered. Nor does plaintiff allege, as discussed above, that he suffered from any adverse employment action.

---

[4] Plaintiff alleges he was born in December 1965, with the first of the allegedly discriminatory acts occurring in March 2011, when he was 45 years old. By alleging he was 45 at the time the allegedly discriminatory conduct began, plaintiff has pleaded he was within the age group protected by the ADEA when he suffered the allegedly adverse employment actions. See 29 U.S.C. § 631(a).

14

IV.     Rehabilitation Act Claim

To state a claim for disability discrimination under the Rehabilitation Act, plaintiff must allege (i) he is disabled within the meaning of the Act; (ii) he was excluded from participation in a public entity's services, programs, or activities or was otherwise discriminated against by a public entity; and (iii) such exclusion or discrimination was due to his disability. See Hargrave v. Vermont, 340 F.3d 27, 34 (2d Cir. 2003). The Rehabilitation Act defines a "disabled individual" as a person who has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B).

In the amended complaint, plaintiff claims he was discriminated against "based on his disability (physical)" when he was temporarily denied LEAP, provided inaccurate information regarding annual leave, ordered to attend fit for duty examinations in 2011 and 2012, and when, on October 9, 2012, he was notified he no longer met the GS-1811 Treasury Enforcement Agency Qualification Standards and was not medically qualified for full duty as a special agent for the IRS.

First, because the amended complaint is devoid of any details regarding plaintiff's alleged handicap or disability, plaintiff fails to state a claim under the Rehabilitation Act.[5] See Hedges v. Town of Madison, 456 F. App'x 22, 24 (2d Cir. 2012) (summary order) (affirming dismissal of Rehabilitation Act and ADA claims because "even the most liberal standard of

---

[5]     The August 3, 2015, EEOC decision found that in December 2008, plaintiff suffered a left rotator cuff impingement injury during defensive tactics training at work, and on November 5, 2009, underwent left rotator cuff repair surgery. Plaintiff subsequently suffered a similar injury in his right shoulder, and underwent surgery again in 2012. The shoulder injuries eventually prevented plaintiff from lifting his arms above shoulder height, and plaintiff was deemed "not able to safely and efficiently do all the duties of his job." (Pl.'s Opp'n Br., Ex. 1 at 9). Accordingly, because plaintiff's shoulder injuries substantially limited his major life activities—namely, his job—plaintiff arguably was "handicapped" under the Rehabilitation Act. However, because plaintiff failed to plead any facts relating to his shoulder injuries in the amended complaint, he has failed to plead the disability element of a Rehabilitation Act claim.

15

pleadings does not require a court" to infer disability where plaintiff did not allege he was disabled under either Act, but instead provided a list of medical conditions).

Moreover, plaintiff has not alleged any facts tending to give rise to even a minimal inference of discriminatory intent. See Elbert v. N.Y. State Dep't of Corr. Servs., 751 F. Supp. 2d 590, 594–95 (S.D.N.Y. 2010) (quoting Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 112 (2d Cir. 2001) (plaintiff must allege his mistreatment "was motivated by either discriminatory animus or ill will due to disability.").

Accordingly, plaintiff fails to state a Rehabilitation Act claim.

V.  Retaliation Claim

"To establish a prima facie case of retaliation, an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012). "Title VII retaliation claims must be proved according to traditional principles of but-for causation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

Retaliation claims under Title VII, the ADEA, and the Rehabilitation Act are analyzed under the same framework. See Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003) (Title VII and ADEA); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (Title VII and Rehabilitation Act).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Wright v. Monroe Cmty. Hosp., 493 F. App'x 233, 236 (2d Cir. 2012) (summary order) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)).

Importantly, the adverse employment action element of a retaliation claim "is not limited

16

to discriminatory actions that affect the terms and conditions of employment." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). Instead, it is understood to "appl[y] broadly to 'employer actions that would have been materially adverse to a reasonable employee or job applicant.'" Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. at 57). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. at 57).

Plaintiff claims he was retaliated against for filing two EEOC complaints that were consolidated for hearing on July 15, 2015. Approximately three weeks after the hearing, on August 4, 2015, plaintiff claims his second level supervisor, Manny Muriel, directed plaintiff to report to Muriel's office for a meeting with Muriel and plaintiff's supervisor, Joan Totani. Plaintiff further claims he was "inaccurately" advised the meeting was "not disciplinary in nature." (Am. Compl. ¶ 27). At the August 4, 2015, meeting, plaintiff claims he was "threatened with discipline due to his filing of the two EEO complaints" and was "further threatened . . . with civil action for slander with regard to [his] comments that SSA Totani's testimony at the July 15, 2015 hearing was not completely truthful." (Id. ¶ 28). According to plaintiff, "[b]ut for the EEO complaint and a Treasury Inspector General for Tax Administration (TIGTA) complaint," he would have been disciplined. (Id. ¶ 27).

Muriel sent plaintiff a "follow-up" email on August 18, 2015, that "put the threat of discipline into writing, all designed to retaliate against [plaintiff] for his EEO activity." (Id. ¶ 29). The email "recaps [the] discussion at the August 4, 2015 meeting" and concludes:

17

"You are NOT to cause discord or dissention amongst the employees or management. If this conduct continues, it could lead to disciplinary action." (Id. ¶ 30).

The Court concludes that plaintiff fails to allege he suffered materially adverse action sufficient to support a retaliation claim. "Courts in this circuit have held that 'reprimands that do not lead to materially adverse employment consequences are not actionable forms of retaliation.'" Frazier v. City of N.Y. Dep't of Correction, 2016 WL 4444775, at *3 (E.D.N.Y. Aug. 23, 2016) (internal quotation marks omitted) (collecting cases).[6]

Plaintiff does not claim he suffered any other employment consequences or actual injury as a result of his employer's allegedly adverse action. In fact, plaintiff claims he would have been disciplined but for his EEOC and TIGTA complaints. See Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 569 (2d Cir. 2011) (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. at 67) ("Title VII does not protect an employee from 'all retaliation,' but only 'retaliation that produces an injury or harm.'").

Additionally, plaintiff states in a conclusory fashion and without any support that he was threatened with discipline due to his filing of the two EEOC complaints. However, the only fact on which plaintiff relies in making this claim, a quote from an email, actually undermines plaintiff's retaliation claim. The email threatens plaintiff with discipline based on plaintiff's causing "discord and dissention amongst the group employees and management" rather than his

---

[6] The Second Circuit has held that the placement of a formal reprimand letter related to the employee's protected activity in an employee's file could deter a reasonable employee from exercising her rights, and thus satisfies the Burlington Northern materiality standard. See Millea v. Metro-N. R. Co., 658 F.3d 154, 165 (2d Cir. 2011). Here, however, plaintiff was not issued a formal reprimand letter. Moreover, the August 18, 2015, email was not directly related to plaintiff's EEOC complaints, nor did it dissuade plaintiff from filing a second complaint with TIGTA on August 19, 2015, alleging Totani committed perjury at the July 15, 2015, EEOC hearing.

EEOC activity. Moreover, the email clearly specifies the types of conduct that could lead to discipline—none of which is related to EEOC or otherwise protected activity.

Specifically, the email states that Muriel had received numerous complaints regarding plaintiff's conduct, including that plaintiff had asked other employees what feedback they received on their annual performance evaluations, and had created unnecessary stress for a pregnant colleague by discussing a new career ladder structure and promotional decisions. Muriel stated "[a]lthough I cannot specifically prevent you from engaging in these types of conversation[s,] you are to minimize non work related discussions which are disruptive to group operations." (Bretz Decl., Ex. 1). The email further explains that plaintiff's disruptive conduct was causing discord and dissension, and directs plaintiff to cease such conduct and "comply with government-wide standards of conduct as well as local office standards of conduct, work procedures, and office practices established to accomplish the work of the Service." (Id.).[7]

Because "oral and written warnings" that apply the employer's disciplinary policies "do not amount to materially adverse conduct," Chang v. Safe Horizons, 254 F. App'x 838, 839 (2d Cir. 2007) (summary order), plaintiff's retaliation claim must be dismissed.[8]

---

[7] The only references to plaintiff's EEOC activity in the email are: (i) Muriel's discussion of plaintiff's statements accusing Totani of committing perjury at plaintiff's EEOC hearing, which conflicted with the EEOC administrative judge's finding that "Totani's hearing testimony with regard to the material facts of this case [was] clear, consistent, and credible" (Bretz Decl., Ex. 1); and (ii) Muriel's statement that the EEOC decision had previously been sent to plaintiff, despite his claims to the contrary.

[8] Plaintiff claims he resigned from his employment with the IRS, effective December 26, 2015. Plaintiff does not claim his resignation was involuntary, nor does he allege a constructive discharge claim, i.e., that the IRS "intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily." See Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004).

## CONCLUSION

Defendant's motion for judgment on the pleadings is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #28) and close this case.

Dated: June 28, 2017
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge